IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| BETH A. STOKES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:12-cv-04054-SLD-JAG |
| | ) | |
| JOHN DEERE SEEDING GROUP, | ) | |
| a subsidiary of DEERE & COMPANY | ) | |
| a/k/a JOHN DEERE COMPANY; and | ) | |
| JIM GUNNISON, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

As a result of Defendants' alleged workplace harassment and discrimination, Plaintiff Beth A. Stokes ("Stokes") claims she has suffered a loss of enjoyment of life ("LEL") and offers the expert testimony of forensic economist Dr. Stan V. Smith regarding the value of resulting damages.  Defendants have each moved to exclude Dr. Smith's testimony under Federal Rules of Evidence 702 and 403 and *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579 (1993).  Because the parties' briefings exhaustively present the issue, Plaintiff Stokes's request for a *Daubert* hearing, Pl.'s Resp. Mot. Exclude Expert Test. 15, ECF No. 71, is DENIED.  Defendant John Deere Seeding Group's ("Deere") Unopposed Motion for Leave to File a Reply in Support of its Motion to Exclude, ECF No. 73, is GRANTED.  For the following reasons, Defendants' motions to exclude Dr. Smith's testimony, ECF Nos. 65, 67, are GRANTED.

## BACKGROUND

Dr. Smith is a forensic economist with a Ph.D. in economics and an MBA from the University of Chicago.  He has published over fifty articles, including in peer-reviewed journals; co-

1

authored a textbook on LEL, or hedonic damages; taught a forensic-economics-based course on damages at DePaul University College of Law; and testified in over two hundred cases nationwide as an expert on value-of-life issues. He is currently president of Smith Economics Group, Ltd. Pl.'s Resp. Mot. Exclude Expert Test. at 2–3 & Ex. 2.

LEL damages are authorized by 42 U.S.C. § 2000 and under Illinois law, *see Knight v. Lord*, 648 N.E.2d 617, 623 (Ill. App. Ct. 1995) (observing that "loss of a normal life" damages may be awarded when plaintiff suffers "diminished ability to enjoy life") (citation omitted). While expert testimony is not necessary to support an award of hedonic damages, Stokes seeks to have Dr. Smith provide the jury with a formula for mathematically calculating the value of Stokes's alleged LEL. The basis of Dr. Smith's methodology lies in research on the value of statistical life ("VSL"). The VSL studies that Dr. Smith relies on assign a value to life based on data such as (1) consumer behavior studies, e.g., how much a person would pay for protective measures, like installing a smoke alarm, against a risk of death; (2) wage risk differentials, i.e., extra compensation paid to workers because they are performing higher risk jobs; and (3) government cost benefit analyses, i.e., calculations performed by regulators of the marginal costs of reducing risk and saving lives by employing various safety measures. Pl.'s Resp. Mot. Exclude Expert Test., Ex. 5 at 3–4.

To derive a hedonic value, Dr. Smith (1) averages VSL estimates generated by selected VSL "meta-analyses"—each analyzes multiple VSL studies—which "stem from a review of the great majority of literature" on VSL; (2) subtracts the value of "human capital," i.e., economic productivity; and (3) subtracts a conservative reduction factor. Def.'s Mem. Supp. Mot. Exclude Expert Test., Ex. 1 at 12–14, 15–16, ECF No. 66-1. For example, to develop an average VSL for Stokes's case, Dr. Smith selected five VSL meta-analyses—analyses of multiple VSL

2

studies—whose mean yields a VSL of $5.9 million for the statistically average person. Pl.'s Resp. Mot. Exclude Expert Test., Ex. 6 at 33. Dr. Smith the removes the "human capital" component by subtracting future expected wages and benefits, and value of household services, for the statistically average person with 45 years remaining life expectancy. *Id.* In Stokes's case, this produces a VSL net of human capital of $5,187,615[1] in 2013 dollars.[2]

Dr. Smith next makes a conservative reduction of approximately $1 million from VSL. Def.'s Mem. Supp. Mot. Exclude Expert Test., Ex. 1 at 15–16. This reduction occurs, in Dr. Smith's words, for "any and all possible conservative reasons, including anything you would like to add to that; for example, more generous approaches to human capital, variations in the value of life that may cause one side to believe that they are on the high side, et cetera." *Id.* at 15. According to Dr. Smith, if the VSL meta-analyses yielded a different average estimate, his hedonic value—although derived from the VSL figures—would "not necessarily" change, due to "a different selection of a conservative factor." *Id.* at 20.

This average hedonic value—VSL minus human capital, conservatively adjusted—is then discounted to present value based on a statistically average remaining life span. In at least his initial calculations for Stokes, this produced a $131,119 base annual payment for a 59.6-year-old Caucasian female with 24.5 years of remaining life expectancy[3] as of the 2014 anticipated trial date. *Id.* at

---

[1] This figure is 15% higher than the $4.5 million figure Dr. Smith uses in Stokes's report, Def.'s Mem. Supp. Mot. Exclude Expert Test., Ex. 2, and that he discusses in his September 9, 2013 deposition. *Id.* at 4. Stokes does not explain this discrepancy, nor does the short memorandum bearing these calculations—submitted as an exhibit along with Stokes's Response to the Motion to Exclude, Pl.'s Resp. Mot. Exclude Expert Test., Ex. 6 at 33—indicate how this newer figure affects the ultimate hedonic damages values proposed for Stokes's case.

[2] The earlier calculations also used a higher human capital adjustment of approximately $1 million. Def.'s Mem. Supp. Mot. Exclude Expert Test., Ex. 1 at 15. This figure represented, according to Smith, "the average per capita income on a projected and discounted basis for the statistically average person."

[3] Based on an 84.1-year average life expectancy. Pl.'s Resp. Mot. Exclude Expert Test., Ex. 1 at 4.

28–29, 34. To arrive at hedonic damages, this value is modified by the percentage loss of enjoyment of life that the jury finds the plaintiff did and will suffer. In an interview with Dr. Smith's firm, Stokes said she has suffered a 60% to 70% LEL as a result of Gunnison and Deere's alleged conduct. Def.'s Mem. Supp. Mot. Exclude Expert Test., Ex. 3 at 11. Based on this subjective assessment, Smith generated two projections of hedonic damages through 2038: an "upper range" that assumes 60% LEL from the 2008 injury date through a projected trial date of 2014 and 40% thereafter— which anticipates that the fact-finder perceives a successful verdict as ameliorative— and a "lower" range assuming a 30% LEL through trial and 20% thereafter. *See id.* at 7. The upper range yields a cumulative $1,543,455 damages figure; the lower range, $771,719. *Id.* at 3, 6. In sum, Dr. Smith describes his methodology as "a way of explaining to the jury how to go about calculating the value of a statistical life using the Plaintiff's testimony and some simple assumptions," allowing the jury to easily determine a damages value by inputting whatever LEL percentage their fact-finding deems appropriate. *Id.*, Ex. 1 at 37–38.

## DISCUSSION

### I. Legal Standard

Federal Rule of Evidence 702 permits expert witness testimony where "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; ( c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principals and methods to the facts of the case." *Daubert* interpreted Rule 702 to charge district courts with ensuring that expert testimony is reliable and relevant—that is, "whether the reasoning

and methodology underlying the testimony is scientifically valid" and "whether that reasoning or methodology can be applied to the facts at issue." 509 U.S. at 589–93.

Factors that may be considered in assessing the reliability of an expert's underlying technique or theory are: (1) whether it can be tested or is falsifiable; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards and controls; and (5) whether it has been generally accepted within the scientific community. *Daubert*, 509 U.S. at 593–94. Courts have looked to additional factors, including whether the expert extrapolates from an accepted premise to an unfounded conclusion. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "The critical inquiry is whether there is a connection between the data employed and the opinion offered; it is the opinion connected to existing data only by the *ipse dixit* of the expert, that is properly excluded under Rule 702." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) (internal quotation omitted). Regarding the relevance of expert testimony, an expert "must testify to something more than what is 'obvious to the layperson' in order to be of any particular assistance to the jury." *Ancho v. Pentek Corp.*, 157 F.3d 512, 519 (7th Cir. 1998) (citation omitted).

The proponent of expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence under Federal Rule of Evidence 104(a). *See Daubert*, 509 U.S. at 592 n.10. The principles set forth in *Daubert* apply to all expert testimony, not just scientific. *Manpower, Inc.*, 732 F.3d at 806 (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)). Additionally, courts are admonished to keep Federal Rule of Evidence 403 in mind when considering expert testimony. *Daubert*, 509 U.S. at 595. Rule 403 permits exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice,

5

confusion of the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

**II. Analysis**

**A. Dr. Smith's Methodology Is Unreliable**

Defendants maintains that Dr. Smith's testimony on hedonic damages is neither reliable nor relevant under Rule 702 and *Daubert*. Many district courts within the Seventh Circuit have excluded Dr. Smith's testimony regarding hedonic damages for these reasons. *See, e.g.*, *Mercado v. Ahmed*, 974 F.2d 863, 871 (7th Cir. 1992) (upholding, under abuse of discretion standard, district court's exclusion of Dr. Smith's testimony); *Bolden v. Walsh Group*, No. 06 C 4104, 2012 WL 1079898, at *5 (N.D. Ill. Mar. 30, 2012); *Ayers v. Robinson*, 887 F. Supp. 1049, 1059–64 (N.D. Ill. 1995). Indeed, despite claiming that many jurisdictions controlled by *Daubert* have permitted Dr. Smith's testimony on calculating hedonic damages, Stokes points to no supporting Seventh Circuit opinion outside of the Circuit's ambiguous brush with the issue in *Sherrod v. Berry*, 827 F.2d 195, 205–06 (7th Cir. 1987), *vacated and remanded on other grounds*, 856 F.2d 802 (7th Cir. 1988) (en banc).

*Sherrod*—decided prior to *Daubert*'s establishment of current Rule 702 standards—initially affirmed the trial court's admission of Dr. Smith's testimony on hedonic damages. 827 F.2d at 206. At trial, while Dr. Smith had calculated a value for the economic loss suffered by the plaintiff's estate, he only testified generally regarding hedonic damages. *See Sherrod v. Berry*, 629 F. Supp. 159, 162 (N.D. Ill. 1985). Dr. Smith defined the concept of hedonic damages for the jury and provided "some insight into the guidelines that economists use in looking at how society values ... the hedonic value of life, separate from the economic productive value of an individual." *Id.* Sitting *en banc*, the Seventh Circuit later vacated *Sherrod* on other grounds, declining to discuss the

admissibility of Dr. Smith's testimony. 856 F.2d at 807–08. Regarding hedonic damages testimony and other evidentiary rulings in the vacated opinion, the *en banc* panel only said, "We leave these questions for the district court on remand to decide in light of this court's prior discussions of those matters, specifically those found in our earlier vacated opinion." *Id.*

Any construction of this language as an implicit endorsement of hedonic damages testimony was soon dashed. Criticizing Dr. Smith's methodology and its value to the jury, the Seventh Circuit in a later pre-*Daubert* case held that the district court's decision to bar the testimony on hedonic damages was not reversible error. *Mercado*, 974 F.2d at 871. Post-*Daubert* decisions in this circuit have excluded Dr. Smith's brand of testimony on the value of a plaintiff's LEL. *See, e.g., Ayers*, 887 F. Supp. at 1064 (holding that Dr. Smith's hedonic damages proof fails to survive *Daubert* analysis); *Richman v. Burgeson*, No. 98 C 7350, 2008 WL 2567132, at *4 (N.D. Ill. June 24, 2008) ("The majority of cases uncovered by the court hold that the [hedonic damages] testimony is inadmissible under either Rule 702 or *Daubert*."). In short, the weight of mandatory and persuasive precedent counsels strongly against admitting Dr. Smith's testimony.

Stokes contends that prior court criticism is no longer applicable because Dr. Smith's methodology has developed. Pl.'s Resp. Mot. Exclude Expert Test. 12. Specifically, Stokes maintains that Dr. Smith's methodology has overcome the *Ayers* Court's criticisms of his use of a statistically average person and his reliance on VSL studies that assume workers can make accurate risk predictions. *Id.* at 12–13. However, *Ayers* also rejected Dr. Smith's method of deriving a particular VSL benchmark amid the range presented by the various meta-analyses as unscientific "eyeballing," which was not made more reliable by Dr. Smith's "conservative" choice of a lower-range figure. 887 F. Supp. at 1060–61. The Court concludes that Dr. Smith's methodology has not

7

changed as to overcome this criticism, and still fails to meet the standard set forth in Rule 702 and *Daubert*.

Setting aside the reliability of the underlying VSL theory—which many courts including *Ayers* convincingly critique—Dr. Smith's methodology in arriving at a hedonic damages figure for Stokes still involves at least two unreliable steps. *See In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 745 (3d Cir. 1994) ("[A]ny step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible.") (emphasis omitted). Those are: (1) his conservative adjustment and (2) his formula for deriving the value of enjoyment of life from VSL.

According to Dr. Smith's deposition, in at least his initial report for Stokes, Dr. Smith made a roughly $1 million conservative reduction from VSL net of human capital. Def.'s Mem. Supp. Mot. Exclude Expert Test., Ex. 1 at 15. The reduction accommodated "any and all possible conservative reasons ... for example, more generous approaches to human capital, variations in the value of life that may cause one side to believe they are on the high side, et cetera."[4] *Id.* This conservative factor is unreliable both for its constitution and its subjective adaptability. As *Ayers* observed, the fact that an opinion is conservative does not make it scientific. 887 F. Supp. at 1060. Expert testimony need not be "scientific" to pass muster under *Daubert*, but it must be validated by reliable methods. *See United States v. Herrera*, 704 F.3d 480, 486 (7th Cir. 2013), *cert. denied,* 134 S. Ct. 175 (U.S. 2013) (citations omitted). Dr. Smith testified that such conservative reduction factors are "not uncommon" in economics, and the factor's large value offsets any problems resulting

---

[4] As mentioned, Stokes has submitted a more recent calculation by Dr. Smith of Stokes's hedonic damages than appears to have been the basis of his deposition testimony. *See* Pl.'s Resp. Mot. Exclude Expert Test., Ex. 6 at 33. The brief calculations on that exhibit do not mention a conservative reduction factor. *Id.* However, Stokes defends Dr. Smith's use of a conservative estimate in her Response, to which that exhibit is attached, Pl.'s Resp. Mot. Exclude Expert Test. 14. The Court interprets this as confirmation that the conservative reduction remains a part of Dr. Smith's methodology.

8

from its lack of precision. Def.'s Mem. Supp. Mot. Exclude Expert Test., Ex. 1 at 21. However, he provides no explanation or method for calculating the conservative factor based on data or theories originating from economic research, leaving the Court with no option but to conclude that the conservative value is derived through unmethodical, subjective "eyeballing."[5] *See Ayers*, 887 F. Supp. at 1060.

Confirming this inference, Dr. Smith testified that, if the results of the VSL studies had been different, it would "not necessarily" change the hedonic value he recommended, because "there may have been a different selection of a 'conservative factor.'" Def.'s Mem. Supp. Mot. Exclude Expert Test., Ex. 1 at 20. In other words, rather than letting the research inputs dictate the outcome, Dr. Smith would alter his calculation in light of different VSL research results in order to arrive at a figure that cannot be described as anything other than preordained. This built-in, subjective flexibility renders Dr. Smith's theory unfalsifiable and incapable of being independently tested, and limits the capacity of any "standards and controls," should such exist, to guide his methodology. *See Daubert*, 509 U.S. at 593–94. The inclusion of a conservative adjustment therefore makes Dr. Smith's method unreliable.

Dr. Smith's theory for isolating hedonic value within VSL is also unreliable. Under his rubric, VSL minus human capital—adjusted based on any conservative factor— yields hedonic value. *See* Def.'s Mem. Supp. Mot. Exclude Expert Test., Ex. 1 at 12. The implicit rationale is that by removing the value of life attributable to economic productivity, the noneconomic leftover must

---

[5] Dr. Smith's report may account for this conservative factor when it says his selection of $4.1 million rather than $5.4 million in 2008 dollars—representing a conservative yet credible estimate of the VSL averages net of human capital—was based on a review conducted in the late 1980s and increased to account for inflation, Def.'s Mem. Supp. Mot. Exclude Expert Test., Ex. 2 at 9, although this explanation was not given in his deposition. Even if so, the Report still fails to describe any indicia for selecting the decades-old figures over those of the recent meta-analyses.

9

be the value of enjoyment of life. Many courts have rejected this transition from VSL to hedonic value as the basis for expert testimony on hedonic damages. *See, e.g., Smith v. Jenkins*, 732 F.3d 51, 67 (1st Cir. 2013) ("'[T]he [VSL] studies do not relate in any way to the actual component of damages, the *enjoyment* of life.'") (quoting *Wilt v. Buracker*, 443 S.E.2d 196, 205 n.15 (W. Va. 1993)); *Sullivan v. U.S. Gypsum Co.*, 862 F. Supp. 317, 321 (D. Kan. 1994) ("The studies relied on by Mr. Smith do not use methodology designed to calculate the loss of enjoyment of life, yet are nonetheless extrapolated by Mr. Smith into what he claims to be valid data for ... loss of enjoyment of life."

Defendants argue that Dr. Smith's theory should be rejected because it is based on the "unreasonable" premise that an average person would value a percentage chance of death exactly the same as they would value a permanent reduction in both income and enjoyment of life of the same percentage. Def.'s Mem. Supp. Mot. Exclude Expert Test. 13. Rule 702 and *Daubert*, however, do not task courts with evaluating the merits of an expert's conclusions, but merely his methodology. *See Manpower, Inc.*, 732 F.3d at 806 ("Rule 702's requirement that the district judge determine that the expert used reliable methods does not ordinarily extend to the reliability of the conclusions those methods produce—that is, whether the conclusions are impeachable.") (citation omitted). The reasonableness of Dr. Smith's conclusions is an issue for the jury. Rather, the Court rejects Dr. Smith's theory on hedonic value because it is derived through an unreliable methodology.

The hedonic theory seeks to present itself as deductively sound by defining the value of enjoyment of life in terms of the overall value of life minus economic value, two factors which—if not undisputed—at least have empirical bases in VSL and other economic research. This logic is illusory. There is no basis, scientific or otherwise, for asserting that the only components of life's

value are economic productivity and enjoyment. *See Mercado v. Ahmed*, 756 F. Supp. 1097, 1103 (N.D. Ill. 1991) ("[T]here is no basic agreement among economists as to what elements ought to go into the life valuation.") And, in contrast with its VSL foundation, the hedonic inference is not based on any empirical data concerning the value an average person, employer, or government regulator would pay to avoid reduction in *enjoyment* of life. *See* Def.'s Mem. Supp. Mot. Exclude Expert Test., Ex. 4 at 10. Rather, the VSL research is only connected to any particular value placed on enjoyment of life "by the *ipse dixit* of the expert." *See Manpower, Inc.*, 732 F.3d at 806 (citation omitted).

Further, Stokes has not sufficiently shown that Dr. Smith's methodology "has been generally accepted within the scientific community." *Daubert*, 509 U.S. at 593–94. In a 2009 survey[6] in the Journal of Forensic Economics, 83.8% of 173 respondents said they would refuse to calculate lost enjoyment of life in an injury case and 82.2% of 174 respondent said they would critique a calculation of hedonic damages. Pl.'s Resp. Mot. Exclude Expert Test., Ex. 14 at 20–22. This voluntary survey did not use statistical sampling to approximate the views of the entire forensic economics field, nor did it permit respondents the third option of indicating they were simply not familiar with hedonic methodology, *see id.* at 21. Even so, the overwhelming, negative response must at least raise strong doubts as to whether Dr. Smith's methodology can be termed "generally accepted." *See Bailey v. Nyloncraft, Inc.*, No. 11-14199, 2012 WL 3717760, at *5 (E.D. Mich. Aug. 28, 2012) (citing same 2009 survey in finding that Dr. Smith had not established that his method was "generally accepted"). For this reason, and because Dr. Smith's method relies on unfalsifiable and

---

[6] Michael L. Brookshire et al.*, A 2009 Survey of Forensic Economists: Their Methods, Estimates, and Perspectives*, 21 J. Forensic Econ. 5 (2009).

unsubstantiated inferences, as described, it is unreliable. The flaws identified outweigh any validity

lent to Dr. Smith's method should his methodology be found to have been subjected to peer review.

Because Dr. Smith's testimony is inadmissible under Federal Rule of Evidence 702 and *Daubert*,

the Court does not reach Defendants' Rule 403 exclusion argument.

### B. General Discussion of Hedonic Theory Is Also Inadmissible

Stokes requests that, should the Court exclude Dr. Smith's testimony on her personal hedonic damages calculation, he still be permitted to "explain the concept" of hedonic damages to the jury. Pl.'s Resp. Mot. Exclude Expert Test. 15. For example, the *Richman* Court excluded Dr. Smith's testimony as it pertained to calculating damages for the particular plaintiff, but permitted him to explain to the jury the concept of hedonic damages, noting that the view that a person's life value exceeds his or her economic productivity is uncontroversial. *See* 2008 WL 2567132, at *4–*5 (citing *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1244–45 (10th Cir. 2000)). *Richman* reasoned that, given an explanation of the concept of hedonic damages and information on the plaintiff's life, the jury would be equipped to determine appropriate damages. *Id.* at *5; *see also Case v. Town of Cicero*, No. 10 C 7392, 2013 U.S. Dist. LEXIS 148656, at *34 (N.D. Ill. Oct. 16, 2013) ("Smith may explain what hedonic damages mean and the general factors that are ordinarily considered as part of such damages. No dollar amount may be cited, nor may Smith propose any methodology by which the jury should calculate [plaintiff's] hedonic damages.").

The Court declines to adopt this compromise position. The only sufficiently reliable testimony Dr. Smith could provide covers matters already "obvious to the layperson." *See Ancho*, 157 F.3d at 519. A jury has no need for an expert to make the banal observation that the value of life exceeds a person's economic productivity. Any explanation of hedonic damages more detailed

than that would necessarily involve Dr. Smith's problematic identification of the components in the value of enjoyment of life calculation. While placing a value on that which makes life worth living is a daunting task, Stokes has not shown that Dr. Smith has any more reliable insight into this matter than an average person. *See Mercado*, 756 F. Supp. at 1103. By allowing compensation for loss of enjoyment of life, Congress and the Illinois legislature implicitly trust that a lay jury can competently assess the value of enjoyment of life. Dr. Smith's generalized discussion of hedonic damages would not further "help the trier of fact" in this role and therefore is excluded under Rule 702.

### C. Defendant Gunnison's Motion to Exclude Is Not Denied As Untimely

Stokes argues that Defendant Gunnison's motion to exclude Dr. Smith's testimony should be denied as untimely. Pl.'s Resp. Gunnison Mot. Exclude Expert Test 1, ECF No. 72. Gunnison filed his Joinder in Motion to Exclude the Proposed Expert Testimony of Stan V. Smith, ECF No. 67, on November 14, 2013, despite the Court's directive that all *Daubert* motions be filed by November 13, 2013. Stokes's motion is denied. Stokes was not prejudiced by the one-day delay. She had, and exercised, a full opportunity to respond to Gunnison's one-page joinder motion, which required no substantive argument in response beyond what Stokes prepared against Deere's motion.

### CONCLUSION

Plaintiff Stokes's request for a *Daubert* hearing, Pl.'s Resp. Mot. Exclude Expert Test 15, ECF No. 71, is DENIED. Defendant Deere's Unopposed Motion for Leave to File a Reply in Support of its Motion to Exclude the Proposed Expert Testimony of Stan V. Smith, ECF No. 73, is GRANTED. Defendants' Motions to Exclude the Proposed Expert Testimony of Stan V. Smith, ECF Nos. 65, 67, are GRANTED.

Entered this 21st day of February, 2014.

>                    s/ Sara Darrow
>             _____
>                    SARA DARROW
>             UNITED STATES DISTRICT JUDGE