IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| BETH A. STOKES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:12-cv-04054-SLD-JEH |
| | ) | |
| JOHN DEERE SEEDING GROUP, | ) | |
| a subsidiary of DEERE & COMPANY | ) | |
| a/k/a JOHN DEERE COMPANY; | ) | |
| and JIM GUNNISON, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Plaintiff Beth Stokes is suing her former employer, Defendant John Deere Seeding Group ("Deere"), and former coworker, Defendant Jim Gunnison, under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2, the Illinois Human Rights Act, 775 ILCS 5/2-102, and state tort law. Stokes claims Gunnison sexually harassed her and Deere discriminatorily failed to investigate and discipline this harassment. Gunnison has moved for summary judgment on Counts I and IV, and partial summary judgment on Count III. Deere requests summary judgment on Counts II and V through IX.[1] For the following reasons, Defendant Gunnison's Motion for Partial Summary Judgment, ECF No. 61, is GRANTED, and Defendant Deere's Motion for Summary Judgment as to Counts II, V–IX, ECF No. 62, is GRANTED.

## BACKGROUND[2]

Deere manufactures planters, a type of large farm machinery, at a facility in Moline, Illinois. Stokes worked for Deere from 1973 until her retirement on August 30, 2013. She was

---

[1] After the parties briefed the summary judgment motions, the Court dismissed Count II in its Order of March 5, 2013, ECF No. 77.
[2] Except where otherwise noted with a specific docket citation, the information in this section comes from the parties' statements of undisputed facts.

1

responsible for inspecting planters after they came off of the assembly line. Gunnison, another 30-plus-year Deere employee, worked in the Repair Department at the Moline facility from 2008 until his retirement on August 1, 2011. Gunnison repaired planters on the assembly line and before they were approved for inventory or shipment.

## I.    Harassment by Gunnison

### A.  Obscene Language and Behavior

While at the Moline facility from 2008 to 2011, Gunnison's desk was near that of an inspector, Larry Richardson, as well as Tyler Fullerton and Charlie Parkhurst, repair personnel like Gunnison. Gunnison testified that he, along with other coworkers, regularly used obscene language at work, including the terms "dickhead" and "suck ass," which Deere supervisors must have been aware of given its ubiquity. Gunnison also said he once or twice declared that Deere-provided employee appreciation meals "taste[d] like dick," and that he called Fullerton "queer" on occasion.

Stokes claims Gunnison used those terms and similar ones like "homo, pervert, fucking ass eater, dick licker, cock sucker" and "bitch" when talking with other male employees at Deere. Stokes June 10, 2013 Dep. 109:21–110:24, 113:18–20, ECF No. 62-8. Gunnison also sometimes engaged in suggestive horseplay and "humping" motions with the other men, according to Stokes. *Id.* 114:11–15. In November 2010, while passing by his desk in the course of her duties, Stokes claims she noticed on about four occasions that Gunnison's computer screen displayed a hotdog and meatballs arranged to look like male genitalia. Stokes Mar. 15, 2013 Dep. 169:11–173:13, ECF No. 62-3. The image had disappeared, however, by the time Stokes returned with her camera to take a picture. *Id.* Stokes never complained of this language or behavior to her supervisors. Stokes June 10, 2013 Dep. 114:4–5, 114:20–22.

While Stokes testified that Gunnison insulted her, he "never called [her] any sexually derogatory names." Stokes Mar. 15, 2013 Dep. 77:20–23, ECF No. 70-4. On one occasion, however, she heard Gunnison call her a "bitch" in the earshot of Parkhurst and possibly another male coworker, she testified; Gunnison claims he never used the word to refer to a Deere employee. *Id.* 78:7–80:17; Gunnison Dep. 74:14–18, ECF No. 64-1. Stokes did not report this incident to her supervisors or include it in her EEOC Charge of Discrimination or her Complaint in this suit. Stokes Mar. 15, 2013 Dep. 78:2–6, 81:9–12, 84:19–85:23, ECF No. 70-4. During her March 15, 2013 deposition, Stokes explained that she did not necessarily consider "bitch" a "sexually derogatory name" because "it's become so common it's hard to distinguish it sometimes." *Id.* 78:2–6.

In support of her claims, Stokes also alleges several workplace interactions between her and Gunnison. These began in late 2008.

### B. Slander Incident

Stokes testified that between September 1, 2008, and March 1, 2009, Gunnison gave false and negative reports about Stokes's work performance to their supervisors and repair personnel and assemblers in the facility. Stokes Mar. 15, 2013 Dep. 93:1–16, ECF No. 64-5. Gunnison said, she claimed, that Stokes did not do her job, did not know how to do it, was terrible at it, and should not have it. *See id.* 93:17–22. She personally heard these comments on at least one occasion. *Id.* 97:7–10. She testified that she heard Gunnison tell her supervisor over an internal radio channel that she "is not around to inspect this planter and they want to get this planter inspected, and she needs to get out here and inspect this planter, it's been sitting here forever." *Id.* 94:2–15. In fact, Stokes testified, her counterpart Richardson had been inspecting that planter and he was thus the likelier inspector to finish the job, which Gunnison knew. *Id.* 95:2–9.

Stokes said she protested this incident to her supervisor at the time, Ken Kinnan, but does not think he confronted Gunnison. *Id.* 96:23–97:6.

### C. Throwing Keys Incident

In or around February 2009, Stokes saw Gunnison drive a Gator, a compact-utility vehicle used on the factory floor at Deere, and stop near the women's locker room. She asked Gunnison for the keys to the Gator, and he threw them to her. Female Deere coworker Kerry Scott had been on the Gator with Gunnison, but Stokes claims she had entered the locker room by the time Gunnison threw the keys. Stokes Decl. ¶ 15, ECF No. 64-3. Stokes claims he threw the keys at her chest in an overhand motion, and they painfully struck her chest. *Id.* He claims he tossed the keys into her outstretched hand, and they did not strike her chest. Gunnison Dep. 110:8–10, ECF No. 70-6. It is undisputed that Kinnan investigated the incident following Stokes's complaint, including speaking with Gunnison and Scott, but found insufficient evidence that Gunnison had engaged in misconduct. According to Deere Workforce Planning Coordinator Jamie Minor's later investigation, both Gunnison and Scott indicated during Kinnan's investigation that Gunnison had thrown the keys underhanded and Stokes had caught them. Minor Dep. 100:20–23, ECF No. 69-2.

### D. Spitting and Cursing Incident

On March 14, 2009, Stokes and Gunnison had an argument in front of other Deere employees. Stokes claims her coworker told her that Gunnison wanted to move planters outside, but Stokes disagreed because the weather was bad and she thought she would eventually need to inspect them. Stokes Decl. ¶¶ 16–17, ECF No. 64-3. When she questioned him, Gunnison allegedly started yelling and swearing and got in her face. *Id.* Gunnison claims it was Stokes who started the yelling, while she was still about 30 feet away, and continued as they drew face

to face.  Gunnison Dep. 91:5–95:16, ECF No. 69-1.  Claiming that she was "fearful" that Gunnison "could" harm her, Stokes Mar. 15, 2013 Dep. 110:14–111:5, ECF No. 63-4, Stokes pushed Gunnison away.  Stokes claims Gunnison also "threatened her"—that she was going to "pay for" and/or "regret" this encounter.  *Id.* 110:14–22.  Gunnison maintains that, after she pushed him, he said, "That is the last time you'll ever put your hands on me," but then went back to work.  Gunnison Dep. 96:7–13, ECF No. 69-1.

Deere Labor Relations Manager Richard Nelson, after interviewing employees who witnessed the argument, determined that both Stokes and Gunnison had contributed to it, but Stokes violated Deere's Violence Prevention Policy and related work rules by escalating the argument with her use of physical force.  Following a disciplinary hearing on March 19, 2009, Stokes was suspended for 30 days, but the suspension was later reduced.  Gunnison was not disciplined.  He testified that, prior to the hearing, he told his side of the story to a Deere supervisor, but said he did not want any disciplinary action taken against Stokes, that he "can handle getting pushed by somebody."  *Id.* 97:10–18.

### E.  Picture Incident

When Stokes returned to work on April 6, 2009, following her suspension, she discovered, taped in her workspace, about 25 photocopied pictures of Gunnison sitting on a Gator next to Deere Manager Marsha Hartman.  On April 14, 2009, Stokes complained of the pictures to Kinnan.  The pictures were visible to other Deere employees, but only Stokes reported them.  The day she complained of them, Kinnan removed the pictures and brought them to Labor Relations Administrator Denny Black.  Black investigated the matter, but was unable to determine who had posted the pictures.  As part of his investigation, Black called and questioned Gunnison, who had been on work assignment in Idaho since late March.  Black may or may not

have maintained notes from the investigation. Gunnison testified that he did not post the pictures, did not actually have a copy at work of the picture—he thought Parkhurst took the photo on Parkhurst's phone several months before the incident—and had not been home "in almost a month" when Black called him in Idaho. Gunnison Dep. 122:2–123:22, ECF No. 69-1.

### F. Blocking Incidents

According to Stokes, Gunnison blocked exit doors with equipment on several occasions. Stokes Decl. ¶ 21, ECF No. 64-3. On November 24, 2009, Stokes saw Gunnison place some equipment near a factory doorway. She did not know if he did so purposely to block the doorway. Stokes Aug. 2, 2013 Dep. 194:8–11, ECF No. 62-9. Six days later, Stokes sent an email to her supervisor, Jeff Ryder (who replaced Kinnan), in which she said Gunnison had blocked the doorway on November 24, 2009, and attached a picture she had taken of the equipment near the doorway. Ryder received the email but did not understand it to be a sexual harassment complaint. Ryder Decl. ¶ 3, ECF No. 62-11. Ryder does not recall speaking to Gunnison about the incident, but does believe he emailed Gunnison's supervisor, Shay O'Neal, although he does not recall O'Neal's response. Ryder Dep. 52:5–18, ECF No. 64-6.

Ryder's notes from around that time state: "Beth brought to my attention repair guys are blocking her door to the south lab which is a safety issue and makes her go outside and around to get through." *Id.* 51:5–9 & Ex. 2. At his deposition, however, Ryder testified that he did not himself view such activity as posing a safety issue, and did not know why he wrote that. *Id.* 51:10–12. Ryder also wrote that he thought "games [we]re being played" by the repairmen. *Id.* Ex. 2. Stokes testified that on other occasions, Gunnison and Parkhurst would block the exit door with a planter while moving it out of the way to bring in additional planters. Stokes Mar.

15, 2013 Dep. 157:19–158:7, ECF No. 70-4. Stokes did not indicate whether she ever reported these blocking incidents.

### G. Planter Incident

On December 14, 2010, Gunnison began moving a planter with a tractor while Stokes was inspecting the planter and positioned within its arms. Stokes claims Gunnison gave no warning, even though she could see him looking at her. Stokes Mar. 15, 2013 Dep. 185:4–19, ECF No. 62-3. Despite the potential danger, she moved out of the way without injury. Gunnison claims he gave Stokes and a coworker standing next to her, Roger Carlson, warning before moving the planter, by yelling and honking its horn. Gunnison Dep. 133:10–20, ECF No. 62-2. Gunnison said he could see that, where she was standing, Stokes was not in danger of being hit by the planter as he lowered it. Gunnison Dep. 136:13–137:12, ECF No. 69-1. Deere standard safety protocol calls for an employee moving a tractor to alert others by honking the horn. O'Neal Decl. ¶ 3, ECF No. 62-12. Stokes complained of the incident to Ryder, who informed O'Neal. According to O'Neal, he spoke with Gunnison shortly after Ryder notified him. O'Neal said he could not substantiate Stokes's allegation that Gunnison failed to signal before moving the planter due to lack of other witnesses to corroborate her account. *Id.* ¶ 3.

### H. Right Heel Incident

According to Stokes, on January 6, 2011, Gunnison struck her right heel with the wheel of a work tricycle as he rode past her inside the facility, and did not apologize. Stokes Mar. 15, 2013 Dep. 192:7–193:12, ECF No. 62-3. She claims he did not ring the bell or say "excuse me." Stokes Decl. ¶ 24, ECF No. 64-3. Stokes complained to Ryder, who asked O'Neal to investigate. O'Neal questioned Gunnison, who said he repeatedly rang the tricycle's bell as he approached Stokes from her left side, slowed to a stop within a few feet of her, and said "excuse

me" before passing. O'Neal Decl. ¶ 5, ECF No. 62-12; Gunnison Dep. 52:21–53:11, ECF No. 62-2. Gunnison said he felt contact as he rode past, and looked back and saw bolts lying on the floor. Gunnison Dep. 155:5–20, ECF No. 62-2. He told O'Neal he did not know whether he hit Stokes's heel or "ran over a bolt"; in either event, "it was purely accidental." *Id.* 192:3–8, ECF No. 62-2; O'Neal Decl. ¶ 5, ECF No. 62-12. Again, due to the absence of witnesses, O'Neal said he could not substantiate Stokes's claim, and therefore told Ryder that it appeared to have been an accident. O'Neal Decl. ¶ 5.

## I. Name Calling Incident

On February 15, 2011, while backing a planter into the factory, Stokes collided with a table, damaging a nearby wall. Gunnison had placed a crock pot on that table[3] prior to Stokes moving the planter. Gunnison testified that he placed the crock pot on the already-laden table in preparation for an anniversary lunch he was planning to share with Richardson, Fullerton, and Parkhurst. Gunnison Dep. 145:21–147:18, ECF No. 70-6. Gunnison said the table had been there "for a couple of days," and he placed the crock pot on it about four hours before Stokes's collision, when a different planter was parked about three feet away. *Id.* 147:3–5. While Stokes claims Gunnison placed the table and/or crock pot in her path, she acknowledges having no proof that he intentionally did so. Second Am. Compl. ¶ 29, ECF No. 47; Stokes Aug. 2, 2013 Dep. 215:6–8, ECF No. 62-9. Gunnison claims he and his coworkers, when they saw that Stokes appeared to be on a collision course with the table, were "yelling for her to stop." *See* Gunnison Dep. 146:18–22. Additionally, Stokes claims that a few days to a week thereafter, a coworker, John Slack, told her Gunnison had told other coworkers she was "stupid" for backing into the

---

[3] The parties and deponents are inconsistent as to whether the crock pot was on a table or a box. Because this detail is immaterial, the Court will uniformly refer to the structure as a table.

table. *Id.* 215:9–14. Stokes did not report this alleged slander to a Deere supervisor. *Id.* 245:9–11.

### J. Desk Incident

Also on February 15, 2011, Stokes witnessed Gunnison search through the drawers and items at her desk. Stokes testified that Gunnison was moving her personal items around and "acting like he was looking for something." Stokes Aug. 2, 2013 Dep. 212:19–22, ECF No. 62-9. She said that Gunnison left "with his hand closed," leaving her unable to determine whether he took anything. *Id.* 212:23–25. Stokes was sitting within a foot of Gunnison, within clear view, while he was searching her desk. Stokes reported this incident to Ryder, who confronted Gunnison in the main work area. Gunnison claimed he had been looking for a phone book. Ryder told Gunnison to stay away from Stokes's desk. According to Gunnison, Richardson had told him the phonebook was located in the lab office, which was used by Stokes, Richardson, and Karl Kelly. Gunnison Dep. 142:2–21, ECF No. 69-1. He said he did not realize that he was searching Stokes's desk because Stokes was working at another desk; he thought he was at a spare desk the employees used to store "parts and keys and stuff." *Id.* 143:10–18. He did not recall noticing Stokes's personal items in the desk. *Id.* 143:24–144:4. Despite being present and observing, Stokes said she did not ask Gunnison why he was searching her desk or otherwise speak to him "[b]ecause he's intimidating." Stokes Mar. 15, 2013 Dep. 213:20–25, ECF No. 61-5. After that incident, Stokes testified, Gunnison did not look through her desk again. Stokes Mar. 15, 2013 Dep. 215:10–12, ECF No. 70-4.

### K. Gator Use

Employees in Stokes's and Gunnison's department shared access to two Gators. Stokes claims that, from 2008 to June 2011, she made over 15 complaints orally or via email to Kinnan,

Ryder, and her union stewards that Gunnison was improperly using the Gators.  Stokes Decl. ¶ 29, ECF No. 64-3.

Ryder's notes indicate that on October 5, 2009, Stokes told him that Gunnison, Fullerton, and Parkhurst were taking the inspectors' Gator without asking.  Ryder noted that, after asking them to ask Stokes first in the future, Gunnison "got in [his] face real bad and started yelling obscenities and saying it was not her Gator.  Once I got him calmed down, he still did not acknowledge that he would ask her first.  I kind of suspect these guys are playing games."  Ryder Dep. Ex. 2, ECF No. 64-6.  Following another complaint by Stokes that Gunnison used a Gator to cause a confrontation, a November 22, 2010 Ryder email to O'Neal stated that "it looks like [Gunnison] is just taking the Gator now to be difficult, actually I think for the most part that is why he always takes it[,] just to be difficult and cause problems.  (I would say he is playing games[,] which seems very childish)."  *Id.*  Ryder's notes on November 15, 2010, and November 16, 2010, also mention complaints regarding Gunnison's Gator use.  *Id.*

According to Ryder's notes, on January 10, 2011, he emailed O'Neal indicating that Stokes had reported another incident of Gunnison taking the Gator without asking.  *Id.*  Ryder noted that "[e]veryone else asks her first," that Gunnison "continue[s] to get away with these things" and is "never receptive to trying to work anything out with" Stokes even though she was "truly trying," and that Stokes "has come to me visually upset on many occasions this build season"—meaning that "you could see she was close to crying"—due to these Gator disputes.  Ryder Dep. 59:13–25 & Ex. 2, ECF No. 64-6.  Ryder testified at his deposition that he "felt like we should be able to come to an agreement to make sure that [Gunnison] was asking to use the Gator," but no such resolution was forthcoming.  *Id.* 59:4–12.

It is undisputed that the Gators were not assigned to any individual Deere employee. However, according to Ryder, Deere employees are advised to ask the person currently using the Gator before taking it, to ensure its current user is not involved in a project requiring the Gator's continued use. *See id.* 47:9–49:7. Stokes acknowledged that asking her before using the Gator was not required, but it was "a nice courtesy." Stokes Mar. 15, 2013 Dep. 238:6–10, ECF No. 62-3. The other inspector, Richardson, shared use of the Gator with her, and Gunnison did not ask his permission on these occasions either, Stokes said. *Id.* 238:11–19. In response to Stokes's concerns and Ryder's suspicion regarding Gunnison's motives, however, Ryder claims he referred Stokes's complaints to O'Neal "on several occasions." O'Neal questioned Gunnison and reported back that Gunnison said he took the Gator for work-related reasons, not "malicious purposes." *E.g.,* Ryder Decl. ¶ 9, ECF No. 62-11.

On February 21, 2011, Stokes discovered that a Gator was left outside in the rain, and suspecting Gunnison, asked Ryder to investigate. Ryder examined pictures Stokes had taken of the Gator as she discovered it, reviewed security camera footage, and spoke to several employees who had worked during that shift. Nevertheless, he was unable to determine who was responsible for parking the Gator outside. On or about June 2, 2011, Stokes complained to Ryder that Gunnison had moved the Gator, causing Stokes to be unable to find it when she needed it for a work purpose. Ryder conveyed Stokes's complaint to Labor Relations Administrator Richard Finnessy and another supervisor, Walter Dudley. Minor Dep. Ex. 8, ECF No. 64-2. Minor testified that she did not know if the matter was investigated further. *Id.* 60:16–23.

## L.  Lockout Incident

According to Stokes, she was attempting to move a planter into the facility on February 28, 2011, when she discovered that someone had locked the overhead door she was planning to enter through.  An ice storm occurred around that time, and it was extremely cold outside.  While she was locked out, Stokes saw Gunnison leave the facility from another door—about 35 feet away, she estimated, Stokes Mar. 15, 2013 Dep. 295:7–9, ECF No. 62-3—while staring at her.[4] Stokes claims that Gunnison usually took a different route.  *Id.* 295:1–4.  Stokes testified that she has no evidence that Gunnison locked the door, but assumes he did.  *Id.* 298:6–7, 300:7–13. Ryder testified that Stokes complained that someone had locked her out; he remembered reporting the incident, but could not recall whom he reported it to, and if he spoke with other employees to figure out what happened.  Ryder Dep. 74:12–75:14, ECF No. 64-6.  Gunnison testified that he did not remember a Deere supervisor questioning him regarding this incident. Gunnison Dep. 159:21–24, ECF No. 64-1.

## M. Heightened Investigation by Deere

Minor conducted an investigation between February 21, 2011, and March 3, 2011, based on Stokes's mounting complaints about Gunnison.  Minor interviewed Stokes, Gunnison, Ryder, O'Neal, and other of Stokes's coworkers.  She also reviewed documentary evidence provided by Stokes.  She reported to Finnessy, who would determine what if any disciplinary action to take against Gunnison, throughout and at the close of her investigation.  Stokes claims that from April 2009 until February 20, 2011, she had made 15 complaints regarding Gunnison's behavior to her supervisors, but did not meet with a Deere representative for a formal investigation until Minor's February 2011 investigation.  Stokes Decl. ¶¶ 9, 12–32, ECF No. 64-3.

---

[4] No evidence indicates that the door through which Gunnison exited, or others spread about the facility, were locked.

Minor interviewed Stokes on February 21, 2011. According to Minor, Stokes related the litany of incidents described above. Minor Decl. ¶ 12, ECF No. 62-1. None of the conduct was sexual in nature or related to Stokes's gender, and Stokes did not complain of Gunnison making sexual or gender-based comments of any kind, Minor stated in an October 15, 2013 affidavit. *Id.* ¶ 13. At the bottom of her notes from that interview, however, Minor wrote the word, "language." Minor Dep. 111:9 – 11, ECF No. 64-2. At her deposition, Minor could not recall the context behind this notation. Further, Minor stated, she "specifically asked Stokes if she believed that Gunnison's conduct was taken because she is a woman, and Stokes responded that she did not believe it was." Minor Decl. ¶ 13. Stokes expressed doubt at her March 15, 2013 deposition as to whether she said that to Minor. Stokes Mar. 15, 2013 Dep. 258:5–6, ECF No. 64-5. Stokes testified: "[I'm n]ot really sure why I said that, if I did, because I do really think that that is the reason why he does that. But I'm going to go with what she wrote down is what I said that day." *Id.* 258:10–14. Minor also wrote "safety concerns" in her notes, but could not recall the context of that remark during her deposition. Minor Dep. 111:15–16. On February 22, 2011, Stokes forwarded Minor emails and pictures depicting Gunnison's conduct; it does not appear that a Deere industrial relations representative had requested these emails prior to then. Minor Dep. 136:9–137:13, ECF No. 64-2.

Minor interviewed Gunnison, who denied any misconduct and explained his version of the incidents alleged by Stokes. Gunnison maintained that Stokes complained of innocent workplace incidents in an attempt to have him disciplined in retaliation for the March 2009 suspension she received for pushing him. Gunnison claimed to Minor that Stokes told other employees he was "no good" and that she was "going to get that son of a bitch." In a deposition, Stokes acknowledged calling Gunnison "a son of a bitch" to other coworkers a few times.

Stokes Mar. 15, 2013 Dep. 167:18–168:17, ECF No. 62-3.   Minor interviewed Ryder and O'Neal, who described their investigations and handling of Stokes's complaints, and Stokes's and Gunnison's coworkers, who opined that the two "just didn't get along" and engaged in "childish behavior."   Minor said Ryder did not tell her he had seen Stokes "visually upset" as a result of the incidents with Gunnison.   Minor Dep. 127:1–3, ECF No. 64-2.

Based on Minor's investigation, Minor and Finnessy found that there were almost no witnesses to any of the incidents, and that many were years old and had been previously addressed by Deere.   They determined that Stokes and Gunnison had a personal conflict that often revolved around Gator use.   In light of these findings, they decided that there were insufficient grounds upon which to discipline Gunnison.   However, to prevent further conflict between Stokes and Gunnison, Finnessy took three steps.   First, he met with Stokes and Gunnison individually on March 3, 2011.   Finnessy warned Gunnison that, while Stokes's preceding allegations against him had been found unsubstantiated, any future misconduct toward Stokes could result in discipline up to and including termination.   For her part, Finnessy told Stokes that she appeared to have a personal conflict with Gunnison but the two had to conduct themselves professionally nevertheless to avoid the risk of future discipline.

Second, Finnessy instituted a new policy clarifying appropriate Gator use so as to reduce a source of friction between Stokes and Gunnison.   Minor later testified that this policy was emailed to employees in Stokes's department, but she did not know whether Gunnison received an email copy of this policy.   Minor Dep. 155:5–16, ECF No. 64-2.   In his affidavit, O'Neal indicated that he sent the new policy to Repair Department employees including Gunnison.   O'Neal Decl. ¶ 11, ECF No. 62-12.   Third, Finnessy told Stokes that Deere would provide her a tricycle for her exclusive use, a move also aimed at reducing her interaction with Gunnison.

Because tricycles were on backorder, however, Stokes did not receive hers until around May or June 2011. Ryder Dep. 69:10–23, ECF No. 64-6. Stokes testified that her Gator use declined as a result of these initiatives. Stokes Mar. 15, 2013 Dep. 303:12–19, ECF No. 62-3.

Minor and the union's Equal Employment Opportunity chairperson, Teri Graves, were also present at Stokes's March 3, 2011 meeting with Finnessy.[5] In her notes from the meeting, Minor wrote that Graves said that "solutions to the problem should be free from harassment." Minor also noted: "Beth: Being a woman some men can't stand she has a Gator." Minor Dep. 149:23–25, ECF No. 64-2. Minor's notes also quoted Stokes as saying she "want[s] him to stop harassing" her, referring to Gunnison. *Id.* 152:9–15.

### N. Gunnison Reports Gator Misconduct by Stokes

On March 11, 2011, Gunnison told Finnessy and other Deere supervisors via email that Fullerton found a Gator behind a curtain and between equipment in Seeding Department 512 shortly after Stokes was seen driving it; Gunnison attached a picture of the Gator as found. Gunnison Dep. Ex. 17, ECF No. 62-2. Finnessy sought corroboration that Stokes had hidden the Gator, and was told by Supervisor Jason Mays that he saw Stokes drive the Gator in the direction of Department 512 shortly before it was found there. Finnessy also received a report that, on March 12, 2011, Stokes was seen hiding in a manager's office with the lights off, allegedly so she could spy on Gunnison and a coworker who were standing nearby outside of the office. Finnessy held a formal meeting with Stokes, Mays, Rider, Fullerton and others to discuss these allegations in a conference room on March 17, 2011. Stokes admitted hiding in the manager's office, and said she had used the Gator shortly before it was found in Department 512, but denied

---

[5] On February 24, 2011, Graves had emailed Stokes after Minor told Graves of Stokes's complaints. Graves Dep. 65:10–19, ECF No. 64-4. Among other things, Graves wrote she thought that "the matter is long overdue and needs immediate attention" and that Stokes "shouldn't have to keep putting up with that crap." *Id.* Ex. 6.

hiding it there.  Finnessy also contacted Steven Pickrell to obtain video footage of Stokes while investigating Gunnison's complaint.

### O.  Near Miss Incident

At the March 17, 2011 meeting, Stokes had told Finnessy that she had been involved in a "near miss" with Gunnison on March 15, 2011.  According to Stokes, Gunnison "came very close to hitting" her while driving a "tugger," another type of vehicle used at the Deere facility. Stokes Decl. ¶ 35, ECF No. 64-3.  Finnessy told Stokes he was aware of the "near miss" and that it was under investigation.  Deere has an online "near miss" reporting system; Safety Coordinator Lawrence Smith was responsible for investigating claims of potential collisions submitted through that mechanism.  Smith investigated Stokes's "near miss" by speaking to several employees, including Stokes, Gunnison, and Hermilio Perez, a Deere employee also involved in the incident.

Smith determined that the following happened on March 15, 2013: Gunnison and Perez were driving machines toward one another in a narrow factory aisle.  Stokes was walking along the side of that aisle toward Gunnison, with Perez approaching from behind.  Gunnison moved his machine over to make room for Perez, crowding Stokes.  When Smith spoke with Stokes, he discovered that she had been unaware that Perez was behind her during the incident.  Smith therefore reported to Finnessy that no one had sought to place another employee in danger during that incident.  As a result, Finnessy decided that the "near miss" did not involve misconduct or warrant disciplinary action.

According to Gunnison, he had slowed his tugger to a crawl as it passed Perez's fork truck in the aisle bottleneck; he was so close that his tugger rubbed the guardrail of Perez's vehicle.  Gunnison Dep. 166:15–167:6, ECF No. 69-1.  He had eye contact with Stokes, so he

could see she knew he was approaching.  *Id.* 169:10–12.  He testified that he would have cleared Stokes by 1.5 to 2 feet had she made full use of the pedestrian walkway and not crowded the side closest to the truck aisle.  *Id.* 168:21–169:3.

### P.  Investigation Debriefing, Bicycle Incident, and Temporary Relocation

Stokes was out on medical leave from March 18, 2011, until April 4, 2011.  On April 5, 2011, Stokes met with her manager, Marilyn Dumolien, who asked if Stokes would prefer to work in a different part of the facility so as to avoid contact with Gunnison.  Stokes declined. Finnessy organized a meeting with Minor, Stokes, and Dumolien in a conference room on April 11, 2011, to discuss the results of his investigation into the allegations that Stokes hid the Gator in Department 512 and hid herself in a manager's office.  Finnessy told Stokes she would not be disciplined.  Stokes testified that Finnessy also said that, due to her earlier suspension, should Stokes incur disciplinary action, it would mean termination.  Stokes Mar. 15, 2013 Dep. 332:9–19, ECF No. 62-3.

At the April 11, 2011 meeting, Stokes reported that Gunnison had recently pedaled his tricycle very close to her in the factory.  According to Stokes, on April 8, 2011, Gunnison "almost hit" her with his tricycle.  Stokes Decl. ¶ 36, ECF No.64-3.  Gunnison testified that he did not recall any such incident.  Gunnison Dep. 172:10–22, ECF No. 69-1.  At the April 11, 2011 meeting, Stokes said there were no other witnesses to this Bicycle Incident.  The Deere supervisors asked Stokes if there was anything she would like Deere to do to address her concerns with Gunnison, and after some discussion, it was agreed that she would work outside her department for the next week until a scheduled factory-wide shutdown.  Finnessy and Dumolien told her to immediately report any further issues with Gunnison to Ryder.  At her June

10, 2013 deposition, Stokes did not recall having any further incidents with Gunnison following that meeting.  Stokes June 10, 2013 Dep. 52:14–53:7, ECF No. 62-8.

## II.        Harassment by Despain

Stokes claims that another of her former coworkers, Mark Despain, subjected her to unwanted, prolonged and painful hugs on multiple occasions between late 2008 and April 2009. Despain allegedly hugged her while making statements such as: "oh, you need a big hug, you are having a bad day."  On April 14, 2009, Stokes complained to Kinnan that Despain continued to hug her despite her vocal opposition. Stokes's personal notes indicate that she said, to Ryder, "Mark Despain is a touchy guy, whether it's a man or a woman.  He has been disciplined for his actions many times in the past."  Stokes Mar. 15, 2013 Dep. Ex. 4, ECF No. 62-4.  The next day, Kinnan confronted Despain and told him to cease hugging Stokes.  Following that, Stokes said she had no further problems with Despain, although she attributes this to the fact that he was transferred to different unit for unrelated reasons.  *See* Stokes Mar. 15, 2013 Dep. 75:5–13, ECF No. 62-3.

On September 16, 1998, another female Deere employee, Connie Haynes, complained that Despain had grabbed his crotch and shook it at her.   According to Deere records, the following day, Black convened a meeting that included Haynes and Despain; Despain was confronted, admitted to the allegation, made an apology (which Haynes accepted), and was warned that future such misconduct would result in discharge.  Minor Dep. Ex. 13, ECF 70-3.  A male Deere worker, Steve Cummings, in 2006 claimed that Despain dropped a handful of snap rings down the coworker's pants, grabbed him with his arm while he was urinating in the bathroom, and touched his buttocks.  This complaint, along with allegations of "horseplay" and a tense incident between Despain and another coworker that was on the brink of physical violence

before a supervisor intervened, led to a disciplinary hearing on March 24, 2006, at which Despain was disciplined with suspension for 30 days, although the time off was waived. *Id.* Ex. 14. Company records show Despain received a two-week and a 30-day suspension in 2010 for disobeying supervisors by leaving the factory without permission, and failing to return to work and work overtime, respectively. *Id.* Ex. 17. Finally, another male coworker, Bill Kranz, complained in late 2009 that Despain (1) put his fingers into Kranz's front pants pocket and pulled downward, (2) pushed his hands into Kranz's pants to tuck his shirt in, and (3) grabbed and twisted Kranz's nipples on multiple occasions. *Id.* At a January 17, 2012 disciplinary hearing, Despain was accordingly fired. *Id.*

Stokes has indicated that she suffered extreme emotional distress as a result of Deere's inaction and Gunnison's conduct, and sought medical counseling as a result. Stokes Decl. ¶ 11, ECF No.64-3.

### III. Relevant Procedural History

Stokes filed a seven-count complaint against Deere and Gunnison on June 14, 2012. Stokes added an eighth count in her First Amended Complaint. On March 28, 2013, the Court granted a motion to dismiss by Gunnison. The Court barred Stokes from pursuing civil assault and battery claims against Gunnison based on the Slander, Throwing Keys, Spitting and Cursing, Picture, and Blocking Incidents, and dismissed Stokes's Title VII sexual harassment claim against Gunnison. Mar. 28, 2013 Order, ECF No. 34. The same day, the Court granted in part Deere's motion to dismiss. The Court dismissed counts of vicarious liability for Gunnison's alleged intentional torts, and Stokes's claim for negligent retention and rehiring. Mar. 28, 2013 Order II, ECF No. 35.

Stokes filed a nine-count Second Amended Complaint on May 6, 2013. Seeking compensatory and punitive damages, Stokes asserts the following claims: intentional infliction of emotional distress by Gunnison (Count I) and Deere (Count II); assault by Gunnison based on the Planter, Right Heel, Name Calling, Desk, Lockout, Near Miss, and Bicycle Incidents (Count III); battery by Gunnison based on the Right Heel Incident (Count IV); Title VII sexual harassment by Deere (Count V); IHRA sexual harassment by Gunnison and Deere (Count VI); Title VII gender discrimination by Deere (Count VII); Title VII and IHRA retaliation by Deere (Count VIII); and Title VII and IHRA hostile work environment by Deere (Count IX). Second Am. Compl., ECF No. 47. On March 5, 2014, the Court dismissed Count II. Mar. 5, 2014 Order, ECF No. 77.

In the motions now before the Court, Gunnison seeks partial summary judgment, dismissing Counts I and IV, and barring Stokes from pursuing Count III based on the Name Calling, Desk, and Lockout Incidents. Gunnison Mot. Summ. J. 1–2, ECF No. 61. Deere requests summary judgment on all counts remaining against it. Deere Mot. Summ. J. 3, ECF No. 62. Gunnison's motion also incorporates Deere's arguments. Gunnison Mot. Summ. J. 2.

## DISCUSSION

### I. Standard on Summary Judgment

Summary judgment is the "put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (internal quotation marks omitted). A court should grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial—that is, whether there is sufficient evidence favoring the non-moving party for a jury to return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 370 (7th Cir. 1997). The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson*, 477 U.S. at 255). There can be no genuine issue as to any material fact, however, when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**II. Analysis**

### A. Count I: Intentional Infliction of Emotional Distress ("IIED") by Gunnison

Gunnison argues that the Slander, Throwing Keys, Spitting and Cursing, Picture, and Blocking Incidents occurred more than two years before the Complaint was filed, and therefore are time barred. Gunnison Mot. Summ. J. 1. The remaining incidents supporting Stokes's IIED claim—the Planter, Right Heel, Desk, Name Calling, Lockout, Near Miss, and Bicycle Incidents—do not meet the elements for an IIED claim, Gunnison contends, and therefore Count I must be dismissed. *Id.* at 2. Gunnison also argues that there is insufficient evidence to support his liability for the Name Calling and Lockout Incidents. *Id.*

### 1. Legal Framework

IIED is a personal-injury tort and therefore carries a two-year statute of limitations under Illinois law. *Feltmeier v. Feltmeier,* 798 N.E.2d 75, 85 (Ill. 2003) (citing 735 ILCS 5/13-202). Generally, the limitations period commences when facts exist that permit one party to sue another. *Id.* However, Illinois applies the "continuing tort" rule to IIED claims. *Id.* at 88. Where a tort involves "a continuing or repeated injury," the limitations period starts on the date the last injury occurs or the tortious conduct ceases. *Id.* at 85 (internal quotation omitted). Ongoing injury from a discrete act is insufficient, but repeated tortious conduct will be viewed as a "continuous whole for prescriptive purposes." *See id.* at 86.

The elements of an IIED claim under Illinois law are:

> First, the conduct involved must be truly extreme and outrageous. Second, the actor must either *intend* that his conduct inflict severe emotional distress, or know that there is at least a probability that this conduct will cause severe emotional distress. Third, the conduct must in fact cause *severe* emotional distress.

*Harriston v. Chicago Tribune Co.*, 992 F.2d 697, 702 (7th Cir. 1993) (quoting *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988)). The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency;" it must be "so severe that no reasonable man could be expected to endure it." *Id.* at 702–03 (citations and internal quotation marks omitted).

"Extreme and outrageous" conduct is judged by an objective standard, *id.* at 703 (citation omitted), based on all the facts and circumstances present in the case, *McGrath*, 533 N.E.2d at 811. Factors to be considered are: the intensity and duration of the plaintiff's distress, the degree of control the defendant exerts over the plaintiff, whether the defendant reasonably believed his objective was legitimate, and the defendant's awareness of any mental or physical condition rendering the plaintiff peculiarly susceptible to emotional distress. *Id.* at 809–11. "Extreme and

outrageous" is a legal standard, and therefore whether conduct rises to this level is a question of law, not fact. *Ulm v. Mem'l Med. Cntr.*, 964 N.E.2d 632, 641–42 (Ill. App. Ct. 2012) (citing *Hayes v. Illinois Power Co.*, 587 N.E.2d 559, 564 (Ill. App. Ct. 1992)); *see also Van Stan v. Fancy Colours & Co.*, 125 F.3d 563, 569 (7th Cir. 1997) (finding summary judgment appropriate where conduct did not rise to level of extreme and outrageous as a matter of law).

Because "personality conflicts" are "unavoidable aspects of employment," finding IIED on their basis would provide a cause of action to nearly all employees. *See Van Stan*, 125 F.3d at 567–68 (citing *Heying v. Simonaitis*, 466 N.E.2d 1137, 1144 (Ill. App. Ct. 1984)) (internal quotation marks omitted). "'[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities' do not amount to extreme and outrageous conduct, nor does conduct 'characterized by malice or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.'" *Id.* at 567 (quoting *Public Fin. Corp. v. Davis*, 360 N.E.2d 765, 767 (Ill. 1976)). However, a "pattern, course, and accumulation of acts" can constitute extreme and outrageous conduct even though the acts comprising the series would not individually rise to that level. *Feltmeier*, 798 N.E.2d at 83.

### 2. Analysis

Stokes alleges a continuing pattern of offensive conduct by Gunnison, starting in September 2008 and running through the Bicycle Incident on April 8, 2011. She filed her Complaint on June 14, 2012, which was less than two years following the date of this last alleged incident contributing to her cumulative emotional distress. *See Feltmeier,* 798 N.E.2d at 85. Under the Illinois continuing tort rule, therefore, none of Stokes's claimed incidents would be time-barred for purposes of supporting her IIED claim. *See id.* at 85–86.

Gunnison argues, however, that the continuing tort rule does not apply because more than a year passed between the 2008 and 2009 alleged incidents and those within the statutory period of limitations, beginning with the Planter Incident on December 14, 2010. Gunnison Reply 5, ECF No. 69. Gunnison maintains that *Feltmeier*'s observation that the abuse at issue there "spanned the entire 11-year marriage," 798 N.E.2d at 88, implies that the underlying incidents must be "truly continuous" for the rule to apply, and the incidents Stokes alleges occurring prior to the limitations period are "isolated." *See* Gunnison Reply 6.

The Court, however, finds no such implication in *Feltmeier*. The "truly continuous" principle is not evident from the facts of *Feltmeier*, whose recitation contains no dates for individual incidents of abuse and thus supports no inference that these dates must not be separated by a certain time span. *See Feltmeier*, 798 N.E.2d at 79. The closest *Feltmeier* comes to defining the conduct that satisfies the continuing tort rule is its examination of *Pavlik v. Kornhaber*, 761 N.E.2d 175 (Ill. App. Ct. 2001), where *Feltmeier* noted "a continuing series of tortious behavior, by the same actor, and of a similar nature." 798 N.E.2d at 87. Even assuming a year gap, Stokes has alleged a continuing series of misconduct, all by Gunnison, and all related to workplace abuses and injuries, over the three-year period underlying her claims. In these circumstances, the Court finds that the continuing tort rule applies to bring all of Stokes's alleged incidents within the limitations period.

Gunnison maintains that there is insufficient evidence of his wrongdoing in the Name Calling and Lockout Incidents. Courts may not consider inadmissible hearsay for purposes of summary judgment. *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). Out-of-court statements are inadmissible to establish the truth of the matter asserted unless a hearsay exception applies or the statements are non-hearsay. *See* Fed. R. Evid. 801, 803, 804; *Stephens*

*v. Erickson*, 569 F.3d 779, 793 (7th Cir. 2009).  Stokes's only evidence that Gunnison called her "stupid" is Slack's out-of-court account.  Stokes Dep. 214:20–215:8, ECF No. 61-5.  Stokes makes no argument that this statement qualifies for an exception to, or is not defined as, hearsay.

Similarly, Stokes offers no evidence to support her assertion that Gunnison intentionally placed a table bearing Gunnison's crock pot in her path as she operated a planter.  Gunnison's uncontroverted testimony indicates that he placed his lunch-laden crock pot on the table hours before Stokes came through in her planter, and even yelled a warning when it looked like she was going to hit it.  Stokes provides no evidence from a reasonable jury could find that, by doing so, Gunnison intended or was aware of the likelihood that Stokes would suffer injury.  *See Harriston*, 992 F.2d at 702.  Accordingly, this Incident will not be considered when determining whether a material factual dispute exists as to the IIED claim.  By contrast, regarding the Lockout Incident, in light of their undisputedly contentious history, a reasonable jury could infer from Stokes's testimony that Gunnison at least shared responsibility for locking her out because he exited the factory that day in an uncharacteristic manner while staring at her.

The Court finds that each of the alleged Incidents individually do not constitute more than a "petty oppression" and do not rise to the level of IIED as a matter of law.  *See Van Stan*, 125 F.3d at 567.  Stokes argues that the incidents, viewed cumulatively, constitute extreme and outrageous conduct.  Pl.'s Resp. to Gunnison Mot. Summ. J. 8–10, ECF No. 63.  However, the Illinois cases establishing that IIED may be premised on a "pattern, course, and accumulation of acts" involved significantly more severe misconduct.  *See Feltmeier*, 798 N.E.2d at 83; *Pavlik*, 761 N.E.2d at 187.

In *Feltmeier*, for example, the Illinois Supreme Court found allegations of domestic abuse involving "more than a decade of verbal insults and humiliations with episodes where

freedom of movement was deprived and where physical injury was often inflicted" sufficient to support an IIED claim. 798 N.E.2d at 83. The alleged injuries inflicted by the husband included: battering his wife by "striking, kicking, shoving, pulling hair and bending and twisting her limbs and toes"; preventing her from leaving the house to escape the abuse, and engaging in stalking behavior. *Id.* at 79. In *Pavlik*, the plaintiff's employer and psychotherapeutic counselor allegedly used his position to attempt to force her to submit to his sexual desires. 761 N.E.2d at 179. Specifically, the defendant allegedly required Pavlik to stay late and meet with him outside office hours for interactions involving "unwanted sexually explicit discussions," including explicit fantasies about Pavlik, and "unwelcome and offensive touching or gestures," such as sticking his tongue into her nose. *Id.* at 180.

Viewing the evidence entirely in Stokes's favor, the insults and injuries she claims—a few trivial injuries and insults, and petty office pranks that objectively resulted in little humiliation or physical harm—are nowhere near as painful, intrusive, and depraved. Moreover, the Incidents lack another indicium of extreme and outrageous behavior present in *Feltmeier* and *Pavlik*. Unlike in those cases, where the abuse was by a spouse and an employer and therapist, respectively, here Gunnison, a coworker, inhabited no similar position of control or influence over Stokes. *See McGrath*, 533 N.E.2d at 810–11. Further, if Stokes had a physical or mental condition that magnified the distress she experienced from Gunnison's petty offenses, she presents no evidence of it or of Gunnison's awareness of such a peculiar susceptibility. *See id.* at 811. Because Stokes fails as a matter of law to establish that Gunnison's conduct was extreme and outrageous, *see Ulm*, 964 N.E.2d at 641–42, Gunnison is granted summary judgment on Count I.

**B. Count III: Assault by Gunnison**

Stokes claims the Planter, Right Heel, Name Calling, Desk, Lockout, Near Miss, and Bicycle Incidents constituted assaults. Gunnison argues that there is insufficient evidence to support assault claims arising from the Name Calling, Desk, and Lockout Incidents.

**1. Legal Standard**

A person commits assault by creating for another "a reasonable apprehension of an imminent battery." *See Cooper v. Fichter*, 2014 IL App. (1st) 130210-U, 2014 WL 668534, at ¶ 7 (Feb. 18, 2014) (quoting *Rosenberg v. Packerland Packing Co.*, 370 N.E.2d 1235, 1239 (Ill. App. Ct. 1977)). The defendant must intentionally create the apprehension of contact. *See Benitez v. Am. Standard Circuits, Inc.*, 678 F. Supp. 745, 767 (N.D. Ill. 2010) (citing *Parrish v. Donahue*, 443 N.E.2d 786, 788 (Ill. App. Ct. 1982)). A battery occurs when "the defendant intentionally caused a harmful or offensive touching of the plaintiff without the plaintiff's consent." *Id.* An actor "intends" a result that is either desired or substantially certain to result from his act. *See Rockford Redi-Mix, Inc. v. Teamsters Local 325, General Chauffers, Helpers & Sales Drivers of Rockford*, 551 N.E.2d 1333, 1340 (Ill. App. Ct. 1990) (citing Restatement (Second) of Torts § 8A, comm. b, at 15 (1965)).

**2. Analysis**

As explained, Stokes has produced no evidence showing Gunnison placed a table bearing a crock pot with the intent or substantial certainty that Stokes would collide with it while operating the planter during the Name Calling Incident. *See Rockford Redi-Mix, Inc.*, 551 N.E.2d at 1340. There is also no admissible evidence that Gunnison called Stokes stupid, or that such insult placed her in fear of imminent contact. In the Desk Incident, even if Stokes was located nearby, she offers no evidence that while rummaging through her desk, Gunnison gave her a

reasonable apprehension that he was about to come in contact with her. *See Cooper*, 2014 WL 668534, at ¶ 7. Regarding the Lockout Incident, even assuming Gunnison did lock her outside, there is no evidence that Gunnison ever caused Stokes to anticipate imminent contact. *See id*. Indeed, she testifies that Gunnison merely looked at her from a distance. *See* Stokes Dep. 294:11–195:5. Accordingly Gunnison is granted partial summary judgment on Count III, dismissing Stokes's assault claims arising from the Name Calling, Desk, and Lockout Incidents.

### C. Counts V, VII, and IX: Sexual Harassment and Hostile Work Environment

Because Illinois has adopted the Title VII framework for analyzing IHRA discrimination claims,[6] *Zaderaka v. Ill. Human Rights Comm'n*, 545 N.E.2d 684, 687 (Ill. 1989), the Court will address Stokes's Title VII and IHRA sexual harassment claims against Deere, and IHRA claim against Gunnison, simultaneously. Similarly, because the sexual harassment and hostile work environment tests examine the same elements, the Court will analyze Stokes's Title VII and IHRA hostile work environment claims together with her sexual harassment claims.

### 1. Legal Framework

Title VII and the IHRA prohibit discrimination against an employee because of her sex. 42 U.S.C. § 2000e-2(a); 775 ILCS 5/2-102(A). Sex discrimination includes claims of sexual harassment and creation of a sexually hostile or abusive work environment. *EEOC v. Mgmt. Hospitality of Racine, Inc.*, 666 F.3d 422, 432 (7th Cir. 2012); 775 ILCS 5/2-101(E), 5/2-102(D). To survive summary judgment on a sexual harassment claim, a plaintiff must produce evidence of severe or pervasive harassment that occurred because of his sex, and that there is a basis for employer liability. *Hall v. City of Chicago*, 713 F.3d 325, 330 (7th Cir. 2013). To establish a prima facie hostile work environment claim, a plaintiff must establish "that she was (1) subjected

---

[6] A notable relevant exception is that an individual employee may be held liable for sexual harassment under the IHRA, *see* 775 ILCS 5/2-102(D), but not under Title VII, *see* 42 U.S.C. § 2000e-2(a).

to unwanted sexual conduct, advances, or requests; (2) because of her sex; (3) that were severe or pervasive enough to create a hostile work environment; and (4) that there is a basis for employer liability." *Lapka v. Chertoff*, 517 F.3d 974, 982 (7th Cir. 2008).

To be "because of sex," conduct need not be explicitly sexual, but must manifest a sexual character or purpose. *See Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir. 1999). Harassment inflicted on both sexes, or regardless of sex, is not actionable. *Holman v. Indiana*, 211 F.3d 399, 403 (7th Cir. 2000). The "equal opportunity" or "bisexual" harasser is not discriminating based on gender since she treats both sexes badly. *Id.* Absent a demonstration of different treatment of the sexes, courts would extrajudicially transform a statutory ban on gender discrimination into a general "code of workplace civility." *Id.* at 404. "Title VII is not a general prophylactic against workplace animus." *Hall*, 713 F.3d at 330.

### 2. Analysis

Stokes argues that Gunnison's calling her a "bitch" manifests gender animus given: a male-dominated environment at Deere (according to Stokes); Gunnison's alleged preference for working with male employees; and Gunnison's use of other vulgar language— including "dickhead," "suck ass," "queer," and stating that food tasted "like dick"—and sexually suggestive horseplay with male coworkers. Pl.'s Resp. to Deere Mot. Summ. J. 30–31, ECF No. 64.

As the Seventh Circuit explained in *Hall*, whether a term like "bitch" is merely gender specific or actually indicates sex-based animus depends on the circumstances, such as the speaker's conduct with other women and his history with the target of the term. 713 F.3d at 334–35. Thus, when a supervisor called his former lover a "sick bitch," the term was not gender discriminatory because the context indicated it was synonymous with "looney" and motivated by

personal animus due to the failed relationship. *Id.* at 335 (citing *Galloway v. Gen. Motors Serv. Parts Operations*, 78 F.3d 1164, 1168 (7th Cir. 1996)). *Galloway* explained that, in its normal usage, "bitch" is "simply a pejorative term for 'woman'"; it did not refer to some specific female characteristic or suggest that women were categorically inferior in the workplace or unworthy of equal respect. 78 F.3d at 1168.

By contrast, *Hall* noted, calling a female employee variations on "bitch" manifests gender animus where the defendant treated other women poorly. 713 F.3d at 335 (citing *Passananti v. Cook Cnty.*, 689 F.3d 655, 665 (7th Cir. 2012)). *Passananti* explained that "bitch" carried gender animus if its repeated use "was sufficiently pervasive or severe and if the context showed a hostility to the plaintiff because she was a woman." 689 F.3d at 665. *Passananti* held that there was sufficient evidence of sex-based harassment where the plaintiff's supervisor at the sheriff's office called her "bitch," "lying bitch," and "fucking bitch" "to her face nearly constantly for several years," did so in front of coworkers in a manner tending to undermine her workplace authority, and also accused her of violating a department "urine tamper" rule and having sex with a participant in an inmate release program. 689 F.3d at 669. Similarly, in *Hall*, the court found that a jury could find gender animus based on a supervisor's comments about "slap[ping] that woman" where he isolated and assigned the defendant, the only female employee in a traditionally male role in that division, unnecessary menial work. 713 F.3d at 330–34.

In the circumstances of the instant case, Gunnison's calling Stokes a "bitch" is far closer to its use in *Galloway* than the gender animus it manifested in *Passananti*. First, unlike the term's repeated use in *Passananti*, there is no evidence that Gunnison called Stokes "bitch" more than once. 689 F.3d at 665. The insult occurred in the midst of an intensifying personal conflict

30

between Gunnison and Stokes ostensibly based on disagreements over job duties and lacking any indicia of gender animus.[7]  It is telling that Stokes did not report this comment at the time and is unsure whether she perceives this epithet as sexually derogatory in nature.  The other vulgar terms Gunnison used were not female-specific, and there is no evidence that they were ever addressed to or about Stokes.  Unlike in *Hall*, moreover, Gunnison was not in a position to isolate Stokes with demeaning work assignments, and Stokes was not a solitary female employee in an otherwise wholly male work environment, but had several female coworkers.  Hartman Decl. ¶ 1, ECF No. 70-10.  No evidence indicates that Gunnison had any similar conflict with any of these women.  *See id.* ¶¶ 2–5; *Hall*, 713 F.3d at 335.  The surrounding context therefore does not indicate that the hostility manifested by Gunnison's use of the word "bitch" was based on Stokes's gender.  A reasonable jury could not find that, because he called Stokes a "bitch" on one occasion, Gunnison's alleged harassment occurred on the basis of her sex.  *See Galloway*, 78 F.3d at 1168.

As for Despain, undisputed evidence indicates that he directed as much, if not more, harassing conduct at male coworkers than at Stokes and her female coworkers.  His indiscriminate inappropriate physical contact with both male and female Deere employees, therefore, cannot form the basis for Deere's liability for sexual harassment.  *Holman*, 211 F.3d at 403.

As for Deere's direct liability for sexual harassment or hostile work environment, Stokes argues that Deere manifested gender animus by less thoroughly investigating women's complaints of harassment than men's.  Pl.'s Resp. to Deere Mot. Summ J. 31–33.  To support

---

[7] Stokes testified that Gunnison and other male coworkers were "tight" and she did not think Gunnison "liked a woman being in that work group."  Stokes Mar. 15, 2013 Dep. 77:8–11.  However, she testified that Gunnison never said as much, *id.* 77:12-15, and points to no other evidence to support this conclusion.  *See Mills v. First Fed. Sav. & Loan Ass'n of Belvidere,* 83 F.3d 833, 841 (7th Cir. 1996) ("[S]ubjective beliefs of the plaintiff . . . are insufficient to create a genuine issue of material fact.") (internal quotation omitted).

this theory, Stokes relies on *Haugerud v. Amery Sch. Dist.,* 259 F.3d 678 (7th Cir. 2001). However, *Haugerud* found that the plaintiff, a custodian, alleged sex-based animus due to a number of circumstances not present here, including express supervisorial comments about the plaintiff's qualifications, directives that male custodians not help their female counterparts, and failure of the plaintiff's supervisors to take action after hearing derogatory remarks about the female custodians. *See id.* at 693–95. The Court cannot see how *Haugerud* stands for the proposition that investigating male and female employees' complaints differently, standing alone, is evidence of harassment on the basis of gender.

Moreover, there are no grounds here for a jury to find gender animus on the basis of disparate investigations. Stokes maintains that Deere's efforts to investigate her several complaints about Gunnison did not occur until two years after she began complaining, and resulted in no disciplinary action, but Gunnison's mere two complaints about Stokes resulted in several formal meetings and her suspension. Pl.'s Resp. to Deere Mot. Summ J. 33. However, it is undisputed that Deere began investigating Stokes's complaints—which did not begin until September 2008—at least as early as February 2009, when Kinnan investigated the Throwing Keys Incident. Further, Stokes produces no evidence that Deere investigated or resolved the complaints differently because of the complainant's gender. The available evidence suggests, rather, that Deere investigated both Gunnison's and Stokes's complaints and disciplined Stokes but not Gunnison based on Deere's ability to substantiate the respective claims. *Cf. Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 427 (7th Cir. 2004) (noting employer's reasonable response to employee's claim of being called a "slut" did not lead to disciplinary action because interviews with other employees failed to corroborate claim).

Stokes also claims sex-based animus because, she alleges, Deere held disciplinary hearings and disciplined Despain in response to men's complaints, but not women's. Pl.'s Resp. to Deere Mot. Summ J. 33. While it does appear that men's complaints about Despain resulted in more formal proceedings and harsher disciplinary measures, the evidence suggests that this is because the men alleged far more offensive, intrusive, and sexually inappropriate behavior by Despain. Haynes in 1998 said Despain grabbed and shook his crotch at her, and Stokes claimed Despain subjected her to unwanted bear hugs.[8] By contrast, men complained: (1) Despain dropped a handful of snap rings down a co-worker's pants, grabbed him with his arm while the coworker was urinating in the bathroom, and touched his buttocks; and (2) Despain put his hands into a coworker's pants, and grabbed and twisted his nipples in a painful movement on multiple occasions. Stokes presents no evidence that Deere's disparate disciplinary measures corresponding to disparate degrees of inappropriate behavior were accompanied by an additional, gender-based impetus. Absent any such evidence, no reasonable jury could conclude that Deere's investigative responses manifested gender animus.

There is no genuine issue of material fact as to whether Defendants' alleged misconduct occurred because of Stokes's sex. She therefore cannot maintain a Title VII or IHRA sexual harassment or hostile work environment claim. *See Hall*, 713 F.3d at 330; *Lapka*, 517 F.3d at 982; *Zaderaka*, 545 N.E.2d at 687. As a result, Deere and Gunnison are granted summary judgment on Count VI, and Deere is granted summary judgment on Counts V and IX.

---

[8] In her statement of undisputed material facts, Stokes also indicates: "Between 1998 and 2012, Defendant Deere did not conduct any disciplinary hearings after two women complained that Mr. Despain inappropriately touched them." Pl.'s Resp. to Deere Mot. Summ. J. 6. However, in the portion of the record she cites as support, Minor testifies that, in that time period, Deere conducted two disciplinary hearings regarding male complaints; there is no discussion, explicit or implicit, of female complaints. Absent evidence of complaints by other women, therefore, the Court infers that Stokes is simply referring to herself and Haynes with her reference to "two women."

### D.  Count VII: Title VII and IHRA Gender Discrimination by Deere

#### 1.  Legal Framework

A plaintiff can establish a claim of sex discrimination directly through evidence of discriminatory intent, or indirectly.  *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 646 (7th Cir. 2005). To establish a prima facie case under the indirect method, the plaintiff must show she (1) is a member of a protected class, (2) met her employer's legitimate job expectations, (3) suffered an adverse employment action, and (4) was treated less favorably than similarly situated male employees.  *Id.* at 647.  Given a prima facie case, the burden shifts to the defendant to offer a legitimate, nondiscriminatory reason for the adverse employment action, which the plaintiff may rebut if she can show it is a mere pretext.  *Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 687 (7th Cir. 2007).

An adverse employment action is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)) (internal quotation marks omitted).  Courts find adverse employment actions where: (1) an employee's compensation or benefits are diminished or he is fired; (2) a nominally lateral transfer or other change in his job significantly reduces his career prospects; or (3) work conditions are changed so as to subject him to "a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment."  *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (internal quotation omitted).  In the latter category, the changed conditions must "objectively creat[e] a hardship" or constitute a constructive discharge by "making the job unbearable for the employee."  *Herrnreiter*, 315 F.3d

at 744–45 (citations omitted). The classic example is moving the employee's desk into a closet. *Id.* Severe or pervasive harassment because the employee is one of Title VII's protected classes can be an adverse employment action. *Hilt-Dyson v. City of Chi.*, 282 F.3d 456, 466 (7th Cir. 2002). However, "[a]n employee's unhappiness with her employer's conduct or decision is insufficient to support a claim under Title VII." *De la Rama v. Ill. Dep't of Human Servs.*, 541 F.3d 681, 686 (7th Cir. 2008).

A similarly situated employee "must be comparable to the plaintiff in all *material* respects." *Crawford v. Ind. Harbor Belt R. Co.*, 461 F.3d 844, 846 (7th Cir. 2006). Where disciplinary measures are at issue, a similarly situated employee is one who "was performing at a comparable level, had similar qualifications, and conducted herself similarly." *Bottoms v. Ill. Dep't of Human Servs.*, 281 F. App'x 561, 564 (7th Cir. 2008) (citing *Radue v. Kimberly-Clark Corp.,* 219 F.3d 612, 617 (7th Cir. 2000)). This generally entails establishing that the plaintiff and the comparator were subject to the same supervision and standards and engaged in similar conduct "without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 404–05 (7th Cir. 2007) (quoting *Radue*, 219 F.3d at 617–18). The "similarly situated" inquiry is flexible and context-attuned; there need only be "substantial similarity" on the relevant factors, not complete identity. *Id.* at 405. The test for whether employees engaged in similar misconduct is whether that conduct was of comparable seriousness. *Peirick*, 510 F.3d at 689. Instances of comparably serious conduct include violating the same company rule or engaging in conduct of similar nature. *Id.*

## 2. Analysis

Severe or pervasive harassment by her coworkers could constitute an adverse employment action, but as explained, Stokes has not established an actionable harassment claim based on her membership in a Title VII protected class. *See Hilt-Dyson*, 282 F.3d at 466. Stokes argues that Deere's "failure to conduct proper investigations for nearly two years" based on her complaints about Gunnison itself constitutes an adverse employment action, as it facilitated his harassment, leading to an unsafe and humiliating workplace environment. Pl.'s Resp. to Deere Mot. Summ. J. 40. She relies on *Bernstein v. Bd. of Educ.*, No. 98-3910, 1999 U.S. App. LEXIS 18702, at *10–11 (7th Cir. Aug. 9, 1999), for the proposition that an employer's failure to investigate a claim of workplace harassment can be an adverse employment action. Because the employer's alleged ineffectual investigation reasonably could mean that the plaintiff was forced to continue working with coworkers harassed her due to her religion, *Bernstein* found that sufficient inferences of a harmful work environment could be drawn from the allegation of an ineffectual investigation to survive a motion to dismiss. *See id.* at *10–13. *Bernstein* cited *Knox v. State of Indiana*, which similarly held that an employer's failure to address employees' sexual harassment can constitute an adverse employment action. *Knox v. State of Ind.*, 93 F.3d 1327, 1334 (7th Cir. 1996).

Even if evidence showed that Deere failed to investigate Stokes's claims properly, *Bernstein* and *Knox* would not apply to the instant case because there is no evidence that Deere's ineffectual action or inaction exposed Stokes to workplace harassment on the basis of a Title VII protected characteristic. As explained, Stokes offers insufficient evidence from which a reasonable jury could find that Gunnison or Despain harassed her because of her sex.

Even assuming that Deere did not investigate Stokes's complaints that Gunnison once demeaned her work performance to a supervisor, blocked an exit on one occasion, locked a door she was about to use, and drove a tricycle close to her, no reasonable jury could find that these trivial events, even if annoying, created humiliating, degrading, unsafe, or unhealthful conditions posing an objective "hardship." *See id.*; *Herrnreiter*, 315 F.3d at 744–45. Similarly, no reasonable jury could find that Deere's investigations, even if ineffectual, of Stokes's other complaints of minor impacts, unrealized collisions, and the photograph prank—involving pictures that were not obscene or personally insulting, or even of Stokes—created a humiliating or degrading change in her job environment, or significantly increased the safety or health risks of her position. *See Nichols*, 510 F.3d at 780. Even assuming they were all unaddressed or ineffectually addressed, the cumulative effect of the incidents Stokes alleges is still not comparable to the ostracizing, humiliating, and career-stunting implications of moving an employee's desk into a closet. *See Herrnreiter*, 315 F.3d at 744–45.

Further, uncontroverted evidence establishes that when Stokes communicated a discernible complaint about potentially consequential misconduct by Gunnison or Despain, her Deere supervisors investigated and took varying degrees of corrective action based on their ability to determine that misconduct occurred and its seriousness. *See, e.g.*, *Marshall v. Ill. Dep't of Human Servs.*, No. 00 C 4680, 2004 WL 432461, at *5–6 (N.D. Ill. Feb. 18, 2004) (finding no adverse employment action based on employer's alleged failure to investigate and protect plaintiff from harassing coworker where employer properly responded to complaint and lacked notice that claimed misconduct was discriminatory). That Stokes disagreed with the disciplinary decisions Deere reached following its inquiries does not mean Deere subjected her to an adverse

employment action.  *See de la Rama*, 541 F.3d at 686.  In sum, Stokes cannot establish that she experienced an adverse employment action.

Moreover, Stokes has not proffered sufficient evidence from which a reasonable jury could find that Deere treated her less favorably than similarly situated male employees. *Whittaker*, 424 F.3d at 646.  Stokes offers Gunnison as a comparator and argues that Deere investigated his complaints about Stokes after the Spitting and Cursing Incident and her alleged Gator hiding on March 10, 2011, more thoroughly and promptly than Stokes's complaints about Gunnison's inappropriate Gator use.  Pl.'s Resp. to Deere Mot. Summ. J. 40.  However, uncontroverted evidence shows that Stokes and Gunnison did not engage in substantially similar conduct without differentiating or mitigating circumstances. *See Humphries*, 474 F.3d at 404–05. While Stokes complained of Gunnison's mischievous, potentially even dangerous, use of the Gators, there was no dispute that Stokes actually physically struck Gunnison during the Spitting and Cursing Incident complained of, or that third parties partially corroborated Gunnison's claim that Stokes was responsible for hiding the Gator and indicated that Stokes had also hidden in a manager's office without authorization.  Gunnison's inappropriate, risky behavior was different in nature and constituted qualitatively less serious misconduct than Stokes's resort to actual violence in violation of workplace regulation. *See Peirick*, 510 F.3d at 689.   As for their respective misconduct involving Gators, partial corroboration of the allegation against Stokes but not that against Gunnison, and a report that Stokes engaged in additional, different misconduct by hiding in a manager's office, *see id.*, present significant differentiating circumstances.  In the contexts she presents, Stokes and Gunnison were not similarly situated, and Stokes offers no other comparators.

Because Stokes offers insufficient evidence to support a finding that she suffered an adverse employment action, and points to no similarly situated male employees who received more favorable treatment, *see Whittaker*, 424 F.3d at 646, Deere is granted summary judgment on the Title VII and IHRA gender discrimination claims constituting Count VII.

### E.  Count VIII: Retaliation by Deere

#### 1.  Legal Framework

Both the IHRA and Title VII prohibit an employer from retaliating against an employee for opposing impermissible discrimination.  42 U.S.C. § 2000e-3(a); 775 ILCS 5/6-101(A); *Rogers v. City of Chi.*, 320 F.3d 748, 753 (7th Cir. 2003).  Retaliation may be established directly or indirectly.  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).  Under the direct method, a plaintiff must show: (1) he engaged in activity protected by the statute, (2) his employer took an adverse employment action against him, and (3) there is a causal connection between the plaintiff's activity and the employer's action.  *Id.* (Title VII); *Carter Coal Co. v. Human Rights Comm'n*, 633 N.E.2d 202, 207 (Ill. App. Ct. 1994) (IHRA).

#### 2.  Analysis

Stokes proceeds under the direct method, but offers no evidence from which a jury could find that she suffered a retaliatory adverse employment action.  Stokes argues that Deere took such action when it threatened Stokes that she would be terminated "if issues with Defendant Gunnison continued."  Pl.'s Resp. to Deere Mot. Summ. J. 42.  Stokes, however, points to no testimony or other record evidence indicating that such a threat of termination was ever made.  *See id.* at 42–43.[9]  She has therefore failed to show a genuine issue of material fact regarding her

---

[9] Even though she does not reference it in her retaliation argument, Stokes may be referring to her testimony that Finnessy "threatened" her with termination during the April 11, 2011 meeting regarding the investigation into Stokes's alleged hiding of a Gator.  Stokes Mar. 15, 2013 Dep. 332:9–19, ECF No. 62-3.  Because Stokes had already incurred suspension for pushing Gunnison, the next disciplinary measure under Deere's progressive

Title VII and IHRA retaliation claims. *See* Fed. R. Civ. P. 56(c) (requiring that a party asserting that a fact is genuinely disputed "cit[e] to particular parts of materials in the record"); *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) ("[I]f the non-movant does not come forward with evidence that would reasonably permit the trier of fact to find in her favor on a material question, then the court *must* enter summary judgment against her.") Accordingly, Deere is granted summary judgment on Count VIII.

## III. Supplemental Jurisdiction

The only claims that remain in this federal question case are brought under state law. A federal court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). In the Seventh Circuit, "the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999). This general presumption has three exceptions: (1) where a litigant could not refile the claims in state court because a statute of limitations has run, (2) where "substantial judicial resources have been expended on the state claims," or (3) where the outcome of the state claims is "clearly apparent." *Dargis v. Sheehan*, 526 F.3d 981, 990 (7th Cir. 2008). Here, the Court has authored several extensive opinions and significantly narrowed the issues in this case over more than two years of litigation. In particular, the Court's orders have involved extensive analysis of some of Stokes's pendent state claims. In light of the substantial expenditure of the Court's resources on Stokes's state law claims, the Court finds that continuing to exercise jurisdiction over the remaining claims is appropriate. *See Dargis*, 526 F.3d at 990.

---

discipline policy was termination. *See id.* 332:9–13. It is undisputed that Finnessy said Stokes faced termination on the basis of incurring disciplinary action for her own workplace misconduct; there is no evidence connecting this warning to Stokes's reporting harassment by Gunnison or discrimination by Deere. *See id.*; Deere's Mot. Summ. J. 21. There is therefore no evidence of a causal connection between this "threat" of termination and a complaint of discrimination by Stokes. *See O'Leary*, 657 F.3d at 630.

## CONCLUSION

Defendant Gunnison's Motion for Partial Summary Judgment, ECF No. 61, is

GRANTED, and Defendant Deere's Motion for Summary Judgment as to Counts II, V–IX, ECF

No. 62, is GRANTED. Counts I, V, VI, VII, VIII, and IX are dismissed, and in Count III, the

Name Calling, Desk, and Lockout Incidents are dismissed as the basis for Plaintiff's civil assault

claim. Plaintiff's only remaining claims are Count III, civil assault based on the alleged Planter,

Right Heel, Near Miss, and Bicycle Incidents; and Count IV, civil battery based on the alleged

Right Heel Incident.


Entered this 29th day of September, 2014.

_____ s/ Sara Darrow_____
SARA DARROW
UNITED STATES DISTRICT JUDGE
